*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* W. C. SURLINE, Minor.

UNPUBLISHED
February 8, 2024

Nos. 365664; 365665
St. Clair Circuit Court
Family Division
LC No. 21-000053-NA

Before: RIORDAN, P.J., and CAVANAGH and GARRETT, JJ.

PER CURIAM.

In these consolidated appeals, respondent-mother, A. Surline, and respondent-father, C. Surline, appeal as of right the trial court's order terminating their parental rights to the minor child, WCS, pursuant to MCL 712A.19b(3)(c)(*i*), (g), and (j). We affirm.

## I. FACTUAL BACKGROUND

In 2021, respondents were living together with their son, WCS, and respondent-mother's then 13-year-old son from a prior relationship, EW. In January 2021, Children's Protective Services (CPS) investigated the family after receiving reports that respondent-father, while under the influence of drugs, failed to properly supervise WCS. During the CPS investigation, both respondents, on more than one occasion, tested positive for illegal substances.

Between January 2021 and April 2021, respondents were offered voluntary services in an effort to avoid court involvement and removal of the children. When they refused to cooperate with these efforts, petitioner, the Department of Health and Human Services (DHHS), filed a petition requesting that the court authorize the petition and take in-home jurisdiction over the children.

In June 2021, respondents entered no-contest pleas that allowed the trial court to exercise jurisdiction over the children. Thereafter, the court ordered respondents to comply with a treatment plan designed to address substance abuse issues, mental health concerns, domestic violence, and poor parenting skills. Respondents were ordered to participate in, among other things, substance abuse treatment, individual therapy, and parenting classes. They were also ordered to obtain and maintain suitable housing and a legal source of income.

-1-

Although the court initially permitted the children to remain in the home, in November 2021 the children were removed from respondents' care after respondent-father was involved in a motor vehicle accident while under the influence of illegal substances. At the time of the accident, WCS was in the vehicle and not properly secured in his booster seat. Respondent-father was charged with operating while intoxicated, operating a vehicle with a suspended license, and fourth-degree child abuse.

In February 2023, after approximately 21 months of services, DHHS filed a supplemental petition seeking termination of respondents' parental rights. At the conclusion of the March 2023 termination hearing, the court found that DHHS had established statutory grounds for termination by clear and convincing evidence, and that termination of respondents' parental rights was in WCS's best interests, but it declined to terminate respondent-mother's parental rights to her teenage son, EW. These appeals followed.

## II. ANALYSIS OF THE ISSUES

## A. STATUTORY GROUNDS

Both respondents challenge the trial court's findings that statutory grounds for termination of their parental rights were established by clear and convincing evidence. After review of the record evidence, we conclude that there was no error in this regard.

In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination has been established by clear and convincing evidence. *In re Trejo*, 462 Mich 341, 355; 612 NW2d 407 (2000). This Court reviews the trial court's findings under the clearly erroneous standard. MCR 3.977(K). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989).

The trial court terminated respondents' parental rights to WCS under MCL 712A.19b(3)(c)(*i*), (g), and (j), which permit termination under the following circumstances:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

> * * *

> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

> * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The trial court did not clearly err when it terminated respondents' parental rights under these grounds.

The evidence established that respondents came to DHHS's attention in January 2021, after WCS, who was then four years old, was found outside at 4:00 a.m. without any shoes or a coat. At the time, the child was in respondent-father's care and authorities suspected that he was under the influence drugs. During the CPS investigation that followed, respondents tested positive for illegal substances on many occasions. CPS offered respondents voluntary services in an effort to avoid court involvement and removal of their children, but when respondents did not cooperate with these efforts, DHHS filed a petition in April 2021 requesting that WCS, and his half-brother, EW, be made temporary wards of the court. The petition included allegations of substance abuse, domestic violence, mental and emotional instability, a prior suicide attempt, improper supervision, and medical neglect. Despite the seriousness of the allegations, the petition did not seek removal of the children. In June 2021, respondents entered no-contest pleas that allowed the court to exercise jurisdiction over the children and respondents were given an opportunity to participate in services designed to address the barriers to reunification.

The evidence further demonstrated that in November 2021, respondent-father, while under the influence of amphetamine and fentanyl, was involved in a motor vehicle accident and WCS was discovered in the car improperly secured in his booster seat. After the accident, respondent-mother made excuses for respondent-father's actions. Finding that the children were unsafe in respondents' care, the court removed them from the home in November 2021. Respondents were still permitted to participate in services to address their substance abuse issues, mental health concerns, and poor parenting skills. Approximately 21 months after adjudication, and more than 182 days after entry of the initial dispositional order, DHHS filed a supplemental petition seeking termination of respondents' parental rights. The petition alleged, among other things, that respondents failed to benefit from the services offered.

During the review hearings held between June 2021 and February 2023, and at the March 2023 termination hearing, DHHS presented evidence that respondents did not substantially comply with or benefit from their treatment plans. The evidence also clearly and convincingly established that there was no reasonable likelihood that respondents would be in a position to safely and appropriately parent their child within a reasonable time.

The evidence clearly and convincingly demonstrated that respondents had not overcome the most significant barriers to reunification: their substance abuse issues and mental health concerns. Both respondents were offered a multitude of services that included a substance abuse assessment and treatment, a mental health assessment and treatment, and random drug screens. Despite these services, respondents never achieved emotional stability or a drug-free lifestyle.

At the outset, we note that respondent-mother sabotaged DHHS's efforts at nearly every turn. Early on, respondent-mother refused to execute the necessary releases to allow DHHS to obtain full and complete progress reports from her mental healthcare providers. Further, during

two substance abuse assessments, performed in May 2022 and January 2023, respondent-mother misrepresented the nature and scope of her drug use. Indeed, she claimed that she did not abuse illegal substances and denied that drugs had any impact on her or her family. Although DHHS timely referred respondent-mother to appropriate services, her own actions impeded the reunification efforts.

Although, in general, respondent-mother participated in most services, she failed to benefit from the assistance offered. She continued to abuse illegal substances for most of the 21 months the children were court wards. Indeed, she participated in an inpatient treatment program between December 2022 and January 2023, but tested positive for illegal substances less than two weeks after her discharge. In January 2023, a psychiatrist advised respondent-mother of the necessity of discontinuing Adderall. Just days later, respondent-mother requested a prescription for Adderall from her primary care physician. Respondent-mother admitted that she did not inform her doctor that she had been diagnosed with an amphetamine use disorder. From this record, there was clear and convincing evidence that respondent-mother had not adequately addressed her substance abuse issues.

It is clear that respondent-mother was profoundly impacted by the death of another son during these proceedings. Four months after the court exercised jurisdiction over WCS and EW, respondent-mother prematurely gave birth to another child, GS. This medically fragile child never left the hospital and he died approximately eight months after his birth. Respondent-mother remained with GS during his hospitalization. Little was asked of respondent-mother during this difficult time and, by all accounts, it appeared as if she remained substance-free. However, after GS died in June 2022, respondent-mother relapsed and frequently tested positive for controlled substances in the months leading up to the filing of the supplemental petition in February 2023. The caseworkers immediately recognized that respondent-mother's grief contributed to her mental and emotional instability and likely to her relapse. They encouraged respondent-mother to participate in grief therapy, but there was little indication that she was willing or able to fully address her grief and loss. While this is understandable as individuals grieve in different ways and on different timelines, the reality was that respondent-mother also had an obligation to parent her other children. GS's death explains some of respondent-mother's failure to benefit from the treatment plan, but it did not excuse it.

The evidence demonstrated that respondent-father had done nothing to address his substance abuse issues. His wholesale failure to participate in the services offered overwhelmingly supports this conclusion. Further, through much of the case, respondent-father was engaged in criminal conduct that resulted in his incarceration. Respondent-father was incarcerated from December 2021 until August 2022. He was then jailed again in February 2023 and, according to the testimony of a caseworker, he was not expected to be released for several months. Respondent-father's convictions included operating a vehicle under the influence, operating a vehicle with a suspended license, fourth-degree child abuse, and calling in a false bomb threat to the drug screening facility. During his incarceration, respondent-father enrolled in several programs offered through the correctional facility, but he would only attend one or two classes and he was terminated from all the programs. Even when he was not incarcerated, respondent-father made no effort to comply with court-ordered services. The caseworker testified that, other than participating in supportive visitation with WCS, respondent-father did not comply with or complete any other aspect of the treatment plan.

The foregoing evidence clearly and convincingly demonstrated that, at the time of termination, the conditions that led to the adjudication continued to exist. Further, the record clearly established that the obstacles to reunification would not be removed within a reasonable time. Respondents were given 21 months to make meaningful changes in their lives but they were unwilling or unable to do so. There was no evidence that if respondents were allowed additional time, the end result would be any different. Admittedly, in the 1½ months before the termination hearing, respondent-mother had taken some initiative. She was attending substance abuse counseling, had seven clean drug screens, her housing was appropriate, and she was employed part time. Considering the timing, however, respondent-mother's actions appear to be motivated more by the filing of the permanent-custody petition than the sudden desire to be reunited with her children. In any event, respondent-mother admitted that she had not successfully completed two intensive substance abuse programs and that it would be a considerable amount of time before she could demonstrate long-term sobriety. Moreover, there is little evidence that respondent-mother's less than two-month compliance with the treatment plan represented a forward trend, particularly considering respondent-mother's lack of progress during the preceding 21 months. Consequently, there is clear and convincing evidence from which the trial court could conclude that the conditions that led to the adjudication would not be rectified within a reasonable time.

Termination of parental rights under § 19b(3)(c)(*i*) is warranted when "the totality of the evidence amply supports" a finding that the parent has not achieved "any meaningful change" in the conditions that led to the trial court assuming jurisdiction of the child. *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009). DHHS met this evidentiary burden by clear and convincing evidence. Accordingly, the trial court did not clearly err when it found clear and convincing evidence to terminate respondents' parental rights under §§ 19b(3)(c)(*i*).

Considering the same evidentiary record, the court also did not clearly err when it found clear and convincing evidence to terminate respondents' parental rights under §§ 19b(3)(g) and (j). "A parent's failure to participate in and benefit from a service plan is evidence that the parent will not be able to provide a child proper care and custody." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014). "Similarly, a parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *Id*. at 711.

## B. BEST INTERESTS

Respondents also challenge the trial court's finding that termination of their parental rights was in WCS's best interests. After reviewing the record, we conclude that the trial court did not err in this regard.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of the parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). When considering whether termination of parental rights is in a child's best interests, a court may consider a variety of factors. *In re White*, 303 Mich App at 713. These factors include the bond between the child and the parent, the parent's ability to parent the child, the child's need for permanency and stability, the advantages of a foster home over the parent's home, the parent's compliance with the case service plan, the parent's visitation history

with the child, the child's well-being, and the possibility of adoption. *Id.* at 713-714. In addition, the trial court should consider the child's safety and well-being, including the risk of harm a child might face if returned to the parent's care. See *In re VanDalen*, 293 Mich App 120, 142; 809 NW2d 412 (2011). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones*, 286 Mich App 126, 131; 777 NW2d 728 (2009).

"The trial court should weigh all the evidence available to determine the child[]'s best interests." *In re White*, 303 Mich App at 713. The court's focus must be on the child and not the parent. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *Id*. at 90. This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App at 129.

Shortly after his fifth birthday, WCS was made a temporary ward of the court. Although he initially remained in respondents' home, he was removed from their care five months after the adjudication. The removal was precipitated by respondent-father's arrest for operating a motor vehicle while under the influence of amphetamine and fentanyl while WCS was in the vehicle and not properly restrained in his booster seat. WCS was placed in the home of his paternal aunt and uncle. In this placement, WCS's needs were being met and these caregivers wished to adopt WCS in the event the court terminated respondents' parental rights.

By contrast, a preponderance of the evidence suggested that respondents' substance abuse and mental instability posed a threat to WCS's emotional and physical well-being. Respondents were unwilling or unable to make meaningful changes to establish the stability necessary to properly parent WCS and provide him with a safe and stable home environment. When considering a child's best interests, the court may consider the advantages of a foster home over the parent's home. *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012). Further, the trial court may consider the possibility of adoption. *In re White*, 303 Mich App at 713. In this case, a preponderance of the evidence supported a finding that the home of the paternal aunt and uncle was preferable to respondents' homes because it would provide WCS with the care he required to facilitate his continued growth and development.

Respondents both assert that termination of their parental rights was not appropriate because a parent-child bond existed between each of them and WCS. The court considered the nature of the bond and concluded that it did not weigh in favor of preserving respondents' parental rights. The court's finding is supported by a preponderance of the evidence.

The strength and existence of any bond was questionable. One caseworker testified that the ups and downs seen with respondent-mother's emotional stability impacted WCS. The caseworker explained that WCS did not have a good bond with either respondent because they had been inconsistent throughout his entire life. The caseworker noted that WCS would become frustrated with respondent-mother because she would not participate in his more high-energy activities. Moreover, the worker opined that because of respondent-father's multiple incarcerations and the intermittent visits, his ability to bond with WCS was impaired. Further, WCS did not ask about respondent-father. Indeed, WCS was accustomed to respondent-father's absence in his life because that was all he had ever really known. To the extent that a bond may

have existed between WCS and respondents, that bond was clearly weak. Accordingly, the existence of a bond was not a factor that weighed in favor of preserving respondents' parental rights.

Considering the foregoing, on balance, the relevant factors weighed in favor of terminating respondents' parental rights. Termination would provide an avenue by which WCS could achieve the stability, finality, and permanence he required. The trial court acknowledged that WCS's placement with the paternal aunt and uncle would favor reunification, but it went on to properly balance relative placement with other relevant factors. Even though placement with a relative weighs against termination, and such a placement must be considered, a trial court may terminate parental rights in lieu of placement with relatives if it finds that termination is in the child's best interests. *In re Olive/Metts*, 297 Mich App at 43. In this case, the trial court properly balanced relevant factors and it did not clearly err by finding that termination of respondents' parental rights was in WCS's best interests, despite his relative placement.

Affirmed.

/s/ Michael J. Riordan
/s/ Mark J. Cavanagh